Scott M. Lilja (4231)
FABIAN VANCOTT
215 South State Street, Suite 1200
Salt Lake City, Utah 84111
slija@fabianvancott.com
Telephone:  (801) 531-8900
Facsimile:  (801) 596-2814

Robert McL. Boote (Admitted *Pro Hac Vice*)
COZEN O'CONNOR
200 Four Falls Corporate Center, Suite 400
West Conshohocken, Pennsylvania 19428
rboote@cozen.com
Telephone:  (215) 665-4630
Facsimile:  (215) 701-2424

Jennifer Kennedy-Coggins (Admitted *Pro Hac Vice*)
Cozen O'Connor
1230 Peachtree Street, N.E., Suite 400
Atlanta, Georgia 30309
jkennedy-coggins@cozen.com
Telephone:  (404) 572-2066
Facsimile:  (877) 526-3078

*Attorneys for Defendant/Third-Party Plaintiff*

---

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ONSET FINANCIAL, INC., a Utah corporation <br><br> Plaintiff, <br><br> vs. <br><br> WESTCHESTER FIRE INSURANCE COMPANY, A Pennsylvania corporation, <br><br> Defendant. | **WESTCHESTER FIRE INSURANCE COMPANY'S OPPOSITION TO ONSET FINANCIAL, INC'S MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 216-cv-00063-JNP-PMW <br><br> Judge Jill N. Parrish <br> Magistrate Judge Paul M. Warner |

WESTCHESTER FIRE INSURANCE
COMPANY, A Pennsylvania corporation,

               Third-Party Plaintiff,

    vs.

FAMILY PRACTICE OF ATLANTA MEDICAL
GROUP, LLC, a Georgia limited liability company;
SONDIAL PHARMACY, L.L.C., a Georgia limited
liability company; SONDIAL PROPERTIES, LLC,
a Georgia limited liability company; NEXUS
LABORATORIES, INC., a Georgia corporation;
ALPHONSO WATERS; DR. SONDI
MOORE-WATERS,

               Third-Party Defendants.

Defendant, Westchester Insurance Company ("Westchester"), respectfully submits this memorandum opposing Plaintiff's Motion for Summary Judgment.

## INTRODUCTION

On or about November 7, 2014, Plaintiff, Onset Financial Inc. ("Onset"), leased certain office, medical, and laboratory equipment to Sondial Properties LLC ("Sondial"), a limited liability company organized in the state of Georgia, and Family Practice of Atlanta Medical Group, LLC ("Family Practice"), a limited liability company organized in the state of Georgia. Sondial and Family Practice are collectively referred as the "Lessees."

On or about November 24, 2014, Westchester, a Pennsylvania corporation, as surety, issued a Lease Payment Bond ("Bond") in favor of Onset, for the account of Lessees, in the aggregate amount of $2.6 Million. Onset is sometimes referred as the "Obligee."

2

The purpose of Onset's lawsuit is to recover the full amount of the Bond. Onset has moved for summary judgment. Westchester opposes this motion on the ground that Onset, either through reckless non-disclosure on its part, or because of fraud, caused Westchester to issue a bond it never would have issued had all relevant facts been known to it. Westchester also opposes the motion on the ground that Onset failed to give Westchester the notice required by the Bond and that the failure to give such notice prejudiced Westchester. Finally, Westchester opposes this motion because it is premature and discovery is incomplete.

<strong>RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS</strong>

1.      On November 24, 2014, Defendant Westchester, as surety, issued a Lease Payment Bond, Bond No. K09002960 (the **"Bond"**), listing Sondial Properties LLC and Family Practice of Atlanta Medical Group, LLC **("Lessees")**, as Principal, and Onset as Obligee, in the penal sum of Two Million Six Hundred Thousand Dollars ($2,600,000). A copy of the Bond is attached as Exhibit A to the Declaration of Remington Atwood and is also attached as Exhibit A to Onset's Complaint herein. (Declaration of Remington Atwood (hereafter "Atwood Decl.") at ¶ 6 and Ex. A (Answer to Complaint (hereafter "Answer") at ¶ 8).

**Undisputed.**

2.      The Bond states in relevant part, as follows:

> NOW THEREFORE, we the Surety hereby issue this Bond in favor of Obligee, for the account of Principal, in the aggregate amount of Two Million Six Hundred Thousand and No/100 Dollars ($2,600,000.00), which amount is available to Obligee by one or more draws made at any time after the Effective Date hereof to and including the Expiry Date set forth herein or any extended expiration date, by Obligee's submission to the [sic] us, the Surety, of a signed copy of this Bond and an original signed statement(s) reading in substance as follows:
>
> "SONDIAL PROPERTIES, LLC AND/OR FAMILY PRACTICE OF ATLANTA MEDICAL GROUP, LLC (or its permitted successors or

3

> assigns) is in default under the Master Lease Agreement No. OFI0645217
> dated November 7, 2014 and/or Lease Schedule No. 001 dated November
> 7, 2014 (each as amended, supplemented or otherwise modified,
> collectively the "Lease") between SONDIAL PROPERTIES, LLC as "Co-
> Lessee" and FAMILY PRACTICE OF ATLANTA MEDICAL GROUP,
> LLC as "Co-Lessee" (Co-Lessees jointly and severally referred
> collectively as the "Lessee") and Onset Financial, Inc. as "Lessor" (as
> such Lease may be or may have been assigned, amended, extended,
> restated or replaced).

(Atwood Decl. at ¶ 7 and Ex. A.)

**Undisputed.**

3.      As described in the Bond, on or about November 7, 2014, Onset, as lessor, entered into a

Master Lease Agreement No. OFI0645217, dated November 7, 2014 (the "**Master Lease**"), with

Sondial Properties LLC and Family Practice of Atlanta Medical Group, LLC ("**Lessees**") as

lessees. (Atwood Decl. at ¶ 8 and Ex. B.) (Answer at ¶ 5.)

**Undisputed.**

4.      In connection with the Master Lease, Lessees executed and delivered to Onset a Master

Progress Payment Agreement dated November 7, 2014 (the "**MPPA**"), a copy of which is

attached to the Declaration of Remington Atwood as Exhibit C. (Atwood Decl. at ¶ 9 and Ex. C.)

**Undisputed.**

5.      In connection with the Master Lease, Lessees executed and delivered to Onset, as lessor,

a Lease Schedule No. 001 to Master Lease Agreement No. OFI0645217, dated November 7,

2014, including Amendment No. 1 to Lease Schedule No. 001 to Master Lease Agreement No.

OFI0645217, dated November 19, 2014 (collectively the "**Lease Schedule**"), wherein Lessees

promised to pay to Onset amounts described in the Lease Schedule and leased from Onset certain

medical and other equipment and other property, as more particularly described in the Lease

Schedule.  The Master Lease, the MPPA, and the Lease Schedule are hereafter referred to collectively as the "Lease." (Atwood Decl. at ¶ 10 and Ex. D.)

**Undisputed.**

6.      In the Lease Schedule, Lessees agreed to provide a lease payment bond, which Lessees obtained from Defendant Westchester in the form of the Bond. (Atwood Decl. at ¶ 13 and Ex. D.)

**Undisputed.**

7.      Lessees failed to make payments required under the Lease. (Atwood Decl. at ¶¶ 14-16.) (Answer at ¶ 10.)

**Undisputed.**

8.      On April 20, 2015, Onset sent a letter to the Lessees "to provide a courtesy notice" to Lessees that a payment due on April 10, 2015 had not been received.  That letter informed Lessees that if the delinquent payment was not made by April 27, 2015, "we [Onset] will be forced to declare an Event of Default." A copy of this letter is attached as Exhibit F to the Declaration of Remington Atwood. (Atwood Decl. at ¶ 14 and Ex. F.) (Declaration of Scott Finlinson (hereafter "Finlinson Decl.") at ¶ 7.)

**Disputed.  Westchester disputes that this letter documents Lessees' first failure to make a timely payment under the Lease.  In fact, Onset's letter to the Lessees of June 29, 2015, indicated that "Lessees failed to make Progress Payment Charges, beginning at least since February, 2015, as required under the Master Progress Payment Agreement entered into in connection with the Lease."  A copy of the June 29, 2015, letter to Lessees is**

**attached as Exhibit A to Scott Finlinson's Declaration [ECF #41-1]. Remington Atwood, Onset's Vice President of Finance, testified that he believed it to be correct that Lessees failed to make the required payments to Onset during the period February 2015 through June 2015, which constituted a material breach of the underlying agreements.  App. Ex. F, Atwood Dep., p. 96, ln. 3-9.  Further, Mr. Atwood testified that there were several instances beginning in at least December 2014 where Onset, without notice to Westchester, agreed to move the Lessees' payments back beyond their original due dates.  App. Ex. F, Atwood Dep., p. 89, ln. 14 - 90, ln. 25.**

9.      Following the April 20, 2015 letter, Lessees and Onset entered into a Forbearance Agreement, effective April 30, 2015, a copy of which is attached as Exhibit G to the Declaration of Remington Atwood. (Atwood Decl. at ¶ 15 and Ex. G.) (Finlinson Decl. at ¶ 8.)

**Undisputed.**

10.      Lessees paid the first payment described in the Forbearance Agreement, but failed to make a payment that was to be made on June 1, 2016 under the terms of the Forbearance Agreement. (Atwood Decl. at ¶ 16.) (Finlinson Decl. at ¶ 9.)

**Undisputed.**

11.      On June 29, 2015, Onset gave notice to the Lessees of their default under the Lease. A copy of this notice is attached to the Declaration of Scott Finlinson as Exhibit A. (Finlinson Decl. at ¶ 10 and Ex. A.)

**        Disputed. Westchester disputes that June 29, 2015, was the Lessees' first event of default under the Lease.  Onset's letter to the Lessees of June 29, 2015, indicated that**

6

**"Lessees failed to make Progress Payment Charges, beginning at least since February, 2015, as required under the Master Progress Payment Agreement entered into in connection with the Lease." Finlinson Decl., Ex. A [ECF #41-1]. Further, Remington Attwood of Onset testified that there were several instances beginning in at least December 2014 where Onset, without notice to Westchester, agreed to move the Lessees' payments back beyond their original due dates. App. Ex. F, Atwood Dep., p. 89, ln. 14 - 90, ln. 25.**

12.     Also on June 29, 2015, Onset notified Westchester of the Lessee's default, delivered to Westchester a signed statement in the form stated in the Bond, along with a signed copy of the Bond, and requested payment from Westchester in the amount of $2,600,000. A copy of this statement and demand is attached as Exhibit B to the Declaration of Scott Finlinson. (Finlinson Decl. at ¶ 11 and Ex. B.) (Answer at ¶ 11.)

**Undisputed.**

13.     To date, Defendant Westchester has not satisfied Onset's demand for payment, which it is bound and obligated to pay under the terms of the Bond. (Atwood Decl. at ¶ 18.)

**Disputed. Westchester disputes that Onset's demand for payment under the Bond was proper and disputes that it is bound and obligated to make any payment to Onset under the terms of the Bond. At the latest, the Lessees' first late payment and first event of default was in February 2015. Finlinson Decl., Ex. A [ECF #41-1]; App. Ex. F, Atwood Dep., p. 89, ln. 14 - 90, ln. 25. The Bond obligated Onset to provide Westchester with notice of any event of default by the Lessees by written notice within sixty days of the default. A copy of the Bond is attached as Exhibit A to the Declaration of Remington Atwood [ECF #40-1] and is also attached as Exhibit A to Onset's Complaint [ECF #2-1] herein.**

**Therefore, for Westchester to be liable to pay under the terms of the Bond, Onset must have provided Westchester with notice of the Lessees' default by April 2015. Onset, however, did not give Westchester notice of the Lessees' default until a letter dated June 29, 2015. A copy of the June 29, 2015, letter to Westchester is attached as Exhibit B to Scott Finlinson's Declaration [ECF #41-2].**

14.     The amount owed on the Lease exceeds the amount of the Bond. Specifically, the amount owed on the Lease is the sum of $4,068,006.06, consisting of unpaid Progress Payment Charges in the amount of $480,602.06 and the Stipulated Loss Value of $3,588,004.00, together with interest thereon from and after July 1, 2015, both before and after judgment, at the contract rate of eighteen (18%) per annum, together with additional expenditures, including property tax or sales tax, as incurred by Onset. (Atwood Decl. at ¶ 17.)

**Disputed. Onset is barred from recovery because it obtained the Bond while withholding material negative facts from Westchester that would have precluded issuance of the Bond. App. Ex. B, Brulenski Aff., ¶ 18; App. Ex. D, Bresel Aff., ¶ 6.**

**The amount owed, if any, must be based on a computation of Onset's loss had Onset timely informed Westchester of Onset's change in terms of the Lease that concealed defaults that should have then been disclosed to Westchester which would have minimized any loss. See Statement of Additional Material Facts, ¶¶ 28 -29.**

**While the Bond provides for payment that does not expressly require Onset to preserve the leased equipment collateral, the Bond fails to contain an explicit provision absolving Onset from responsibility for the collateral security as required by Utah law.**

***Onset Complaint*, Ex. A [ECF #2-1].  Onset having undertaken to recover the collateral has
the burden to demonstrate that its recovery and disposition of the collateral was reasonable
and such reasonable recovery must reduce Onset's claimed damages.  *Onset Complaint*, Ex.
A [ECF #2-1]; Finlinson Decl., ¶¶ 12-24, Ex. C-E [ECF # 41, 41-3 - 41-5].**

## STATEMENT OF ADDITIONAL MATERIAL FACTS

The following additional material facts show that Onset intentionally concealed highly
negative underwriting information from Westchester and thus obtained the Lease Payment Bond
by its constructive fraud.

1.     In considering a lease transaction of type that is the subject of this case,
Remington Atwood, Onset's Vice President of Finance who oversees its credit departments and
finance departments, stated that Onset follows an underwriting process as set forth in its credit
manual.  App. Ex. F, Atwood Dep., p. 50, ln. 5-21.

2.     In opposition to summary judgment, Westchester has filed the affidavit of Francis
Brulenski, a partner in the firm of Marcum LLP. App. Ex. B, Brulenski Aff. He is a Certified
Public Accountant and Certified in Financial Forensics. App. Ex. B, Brulenski Aff., ¶ 2. Mr.
Brulenski conducted a thorough review of Onset's underwriting process. App. Ex. B, Brulenski
Aff., ¶ 5. As described by Mr. Brulenski, those documents present an undeniable representation
of the financial instability of Lessees and their related companies. App. Ex. B, Brulenski Aff., ¶¶
9, 11, 12, 13, 14. Mr. Brulenski noted that Onset prepared and submitted to CW Onset LLC
(CW) a November 5, 2014 "Credit Package" with its request for funding of the equipment lease
transaction. App. Ex. B, Brulenski Aff., ¶ 11.

3.     Onset's underwriting review revealed that the Lessees and their related companies
were financially unstable.  App. Ex. B, Brulenski Aff., ¶¶ 9, 11, 12, 13, 14.

4.      Onset prepared and submitted to CW Onset LLC (CW) a November 5, 2014

"Credit Package" with its request for funding of the equipment lease transaction.  App. Ex. B,

Brulenski Aff., ¶ 11.

5.      Part of the credit package that Onset had available included:

> Dun & Bradstreet (D&B) business information reports were
> obtained October 8, 2014 regarding the business of FPMG. One of
> the two D&B reports identified the business starting in 2000.A
> review of this DB report reveals that the business was High Risk,
> including a specific disclosure that "the company has been placed
> in a Special Category of BANKRUPTCY or HIGH RISK or
> BUSINESS DETERIORATION." The D&B report also reported
> an open federal tax lien (originally filed in 2010) and negative
> vendor payment experiences reported from July 2014 through
> September 2014.

App. Ex. B, Brulenski Aff., ¶ 11 d).

6.      Onset deviated from its own Credit Policy Manual in the following important

respects:

> a)  "Average transaction size is approximately $900,000…" The
> $2,600,000 Sondial transaction was significantly in excess of
> that amount at almost three-times Onset's average level.
>
> b)  "Customer Criteria" credit guidelines included: "Revenues of
> at least $25MM; net income two of the last three years;
> including the most recent year; debt service coverage ratio of at
> least 125%; total leverage ratio of no greater than 5:1; tangible
> net worth of at least 5 times OFI aggregate exposure and no
> less than $5MM; "Reviewed" or better financial
> statements...No startups." Lessees failed to meet these Onset
> customer credit requirements.
>
> c) "Risk Acceptance Criteria" required the following:
>
> > 1)  "credit bureau reports" when personal guarantors are
> > involved. Onset failed to obtain personal credit bureau
> > reports on Waters and his wife as guarantors on the Sondial
> > transaction.

10

2) three years of business financial statements to be "Audited" or "Reviewed." Onset failed to obtain this information.

3) "Paydex Standard" of greater than or equal to 60. Lessees failed to meet this requirement. The D&B report disclosed 3-month and 24-month Paydex scores of 12 and 15, respectively, which indicated "High risk of late payment" with respect to Lessees.

4) "Customer Concentration" was not to exceed 10%. However, the 3 FPMG related party tenants were projected to be approximately 45% of Sondial's projected revenue, which exceeded the concentration threshold.

5) "Debt Service Coverage" ratio, "Tangible Net Worth" ($5MM minimum); and "Leverage" ratio thresholds were established. Onset's calculations of these amounts document that Lessee failed the respective threshold requirements.

App. Ex. B, Brulenski Aff., ¶ 13.

7. Onset had ample warnings of the Lessees' precarious financial condition, but it chose to proceed with the loan.  App. Ex. B, Brulenski Aff., ¶ 14.

8. In addition to other methods used in conducting its due diligence check, Onset also conducts a Google search of the proposed borrower. App. Ex. F, Atwood Dep., p. 35, ln. 2-9.

9. On April 1, 2014, or more than seven months before the Bond was issued, it was reported in the *Atlanta Journal Constitution*, the *Decatur-Avondale Estate Patch*, and other news sources that Federal Law Enforcement agents executed a search warrant at the offices of Family Practice of Atlanta.  App. Ex. A, Boote Decl., ¶ 3 & Ex. B.  The news reports stated that a spokesman for the U.S. Attorney, Sally Krinlin, EH, indicated that Federal "officials were investigating a Family Practice of Atlanta employee, who allegedly forged an IRS document." *Id*.

10.     On or around the time a Google search would have been conducted on the Lessees by Onset, such a search would have revealed the news reports from the *Atlanta Journal Constitution*, the *Decatur-Avondale Estates Patch*, and other news sources.  App. Ex. A, Boote Decl., ¶ 5.

11.     A search of the Federal Electronic Case Reporting Service using the name Family Practice of Atlanta would have revealed the docket and documents leading to the issuance of the search warrant executed on April 1, 2014, and the application and affidavit for the search warrant which was attached.  App. Ex. A, Boote Decl., ¶ 6 & Ex. C.  The docket shows that on April 2, 2014, the U.S. District Court for the Northern District of Georgia entered an Order granting the Motion of the United States to unseal the application and affidavit for search warrant, which then became publicly available upon a search in the Federal ECF system for the name Family Practice of Atlanta.  App. Ex. A, Boote Decl., ¶ 6 & Ex. C.  On November 21, 2016, Alphonso Waters was indicted based on the matters alleged in the search warrant. App. Ex. A, Boote Decl., ¶ 7& Ex. D.

12.     Any Google search conducted by Onset did not reveal information concerning the April 1, 2014, search warrant of Family Practice of Atlanta.  App. Ex. F, Atwood Dep., p. 35, ln. 10-18.

13.     Mr. Atwood admitted that because there was such a reliance on the Bond, Onset may not have gone through multiple pages of Google.  App. Ex. F, Atwood Dep., p. 36, ln. 3-15.

14.     Atwood also admitted that had Onset known about the statement of the U.S. Attorney's office at the time of underwriting that they were investigating a Family Practice of Atlanta employee, it "probably would have had an impact on our underwriting."  App. Ex. F, Atwood Dep., p. 25, ln. 19 – p. 26, ln. 6.

15.     Onset did not inform Westchester of its own conclusions that the Lease clearly failed to fulfill Onset's underwriting standards. App. Ex. B, Brulenski Aff., ¶ 18; App. Ex. D, ¶ 6.

16.     Westchester believed that Onset was a responsible lessor that would not withhold material negative underwriting information in connection with obtaining an insurance guarantee contract.   Onset Financial, http://www.onsetfinancial.com/our-company (last visited January 9, 2017) ("Our professionalism is unmatched in the industry.").

17.     Onset withheld information that would have precluded Westchester from the issuing the Bond in this suit. App. Ex. B, Brulenski Aff., ¶ 18; App. Ex. D, Bresel Aff., ¶ 6.

18.     Onset knew it was dealing with an insurance company seeking the Bond at issue and knew what information it presented to Westchester for the Bond.  Onset also knew it did not disclose that the lease transaction did not meet its basic underwriting criteria and "that this is by far the riskiest deal that we have presented . . ."   App. Ex. B, Brulenski Aff., ¶ 18.

19.      A condition precedent for Westchester having any liability under the Bond was: "That in the case of an Event of Default (as defined in the Lease), the Obligee will give written notice to the Surety of such Event of Default within sixty (60) days after Obligee gives written notice to Principal of such Event of Default."  *Onset Complaint*, Ex. A [ECF # 2-1].

20.     To appear to comply with that condition precedent, Onset gave notice of the default to Westchester on June 29, 2015, which Onset asserted was the sixtieth day after it issued a default notice to the Lessees, which was not cured ten days later.  Finlinson Decl., Ex. B [ECF #41-2].

21.     In fact, there were multiple defaults that occurred more than sixty days before June 29, 2015. Finlinson Decl., Ex. A [ECF #41-1].

22.     The payment history of the Lessees shows repeated defaults throughout 2015. The

June 29, 2015, letter stated:

> Sondial Properties, LLC and Family Practice of Atlanta Medical
> Group, LLC (collectively "Lessees") are in default of their
> obligations under the above described Master Lease Agreement
> and Lease Schedule to Master Lease Agreement (collectively
> referred to as the "Lease"). In particular, Lessees failed to make
> Progress Payment Charges, beginning at least since February,
> 2015, as required under the Master Progress Payment Agreement
> entered into in connection with the Lease.

Finlinson Decl., Ex. A [ECF #41-1].

23.     In spite of this history of repeated defaults in early 2015, Onset unnecessarily

waited until July 29, 2015, to take any action to recover the collateral, thereby impairing the

security of both Onset and Westchester in the collateral, which was the leased property, which

remains in the possession of the Lessees. Finlinson Decl., ¶ 13, 26 [ECF #41]. As the issuer of

the Bond, early and proper notice to Westchester of a payment default was critical to

Westchester's ability to preserve its interest in the leased property. App. Ex. D, Bresel Aff., ¶ 5.

By not informing Westchester of the Lessees' multiple defaults, Westchester was deprived of the

only real remedy that was available to it, which was to seek to obtain possession of the leased

property. App. Ex. D, Bresel Aff., ¶ 5. The leased property is not in Onset's possession, and it is

not in the possession of Westchester. App. Ex. E, Kennedy-Coggins Decl., ¶¶ 4-5.

24.      Mr. Atwood testified, "when we initially spoke to the lessees, they asked for the

first few months, so it was not just November/December. We pushed January's payment back 30

days," App. Ex. F, Atwood Dep., p. 90, ln. 15-18.  Atwood further testified: "I believe

February's payment then was also not due until April 10th, so what normally would have been

March 10th was deferred 30 days as well, so we did it for the first few months, which is what we

had negotiated with them and with our underwriter on the transaction." *Id*. at p. 90, ln. 20-25.

Despite these material changes to the terms of the lease and the Lessees' payments schedule, and the repeated allowance of late payments, Onset "did not inform the bonding company of the change in terms of the payment requirements." *Id*. at p. 91, ln. 2-5. Atwood admitted that what he described above was a change in payment terms to allow the invoice to be paid in March when ordinarily it would have been due earlier. *Id*. p. 91, ln. 14-20.

25.     On numerous occasions, Onset changed the lease terms to allow the Lessees to effectively make late payments.  App. Ex. F, Atwood Dep., p. 90, ln. 15-18; p. 90, ln. 20-25; p. 91, ln. 14-20. Onset did not provide Westchester with notice of the changes to the Lease. App. Ex. D, Bresel Aff., ¶ 5; App. Ex. F, Atwood Dep., p. 91, ln. 2-5. Even so, Atwood admitted that the Lessees failed to make timely payments to Onset as required under the Lease during the period of February through June 2015.  App. Ex. F, Atwood Dep., p. 90, ln. 15-18. Specifically, the Lessees failed to make the required payments to Onset during the period February 2015 through June 2015, which constituted a material breach of the underlying agreements.  App. Ex. F, Atwood Dep., p. 90, ln. 15-18.

26.     Onset entered into a forbearance agreement effective April 30, 2015. App. Ex. F, Atwood Dep., p. 105, ln. 20 – p. 106, ln. 8 & Ex. 50.  The Lessees made their first payment under the forbearance agreement and then in June 2015 they had a required payment that they missed. App. Ex. F, Atwood Dep., p. 114, ln. 19 – p. 115, ln. 5. According to Atwood, after that missed June 2015 payment, "there were some discussions there, but I don't know that we were able -- ever able to get comfortable with those discussions of have enough confidence that Al [the Lessees] would be able to continue to make payment." *Id*. at p. 115, ln. 6-10.

27.     By letter dated June 29, 2015, Onset finally notified the Lessees that they were in default of the Lease.  Finlinson Decl., Ex. A [ECF #41-1]. On the same day, Onset demanded that Westchester pay the amount secured by the Bond.  Finlinson Decl., Ex. B [ECF #41-2].

28.     The delivery of leased equipment began in January 2015 but continued into at least October 2015.  App. Ex. G, Bagley Dep., p. 120, ln. 8-12; p. 122, ln. 14 – p. 123, ln. 11; p. 136, ln. 11 – p. 137, ln. 8; p. 138, ln. 17-24; p. 139, ln. 3 – p. 140, ln. 4; p. 142, ln. 2-8, 24 – p. 143, ln. 7; p. 152, ln. 7 – p. 153, ln. 18; p. 154, ln. 1 – p. 155, ln. 4; p. 155, ln. 13 – p. 156, ln. 21; p. 162, ln. 6 – p. 163, ln. 21; p. 164, ln. 15 – p. 165, ln. 13; p. 179, ln. 13 – p. 180, ln. 16.

29.     If Westchester had received timely notice that the Lessees were unable to pay in accordance with the original lease that was the subject of the Bond, or notice that Onset changed the lease terms, Westchester could have taken action to protect itself from loss as set forth in the Affidavit of David A. Bresel.  App. Ex. D, Bresel Aff., ¶ 5.

30.     Onset acknowledged that it does not know precisely when or whether the equipment under the Lease was delivered.  Atwood admitted that: "I don't believe that in this case we have ever been able to get that confirmation." App. Ex. F, Atwood Dep., p. 62, ln. 2-6.  Onset was never able to inspect the delivered equipment.  App. Ex. F, Atwood Dep., p. 63, ln. 15-18. Atwood testified that his guess on why the inspection never took place was "that when we attempted the inspection, at that point he [Alphonso Waters of the Lessees] had missed his payment for the month ….and so he probably was just being difficult."  App. Ex. F, Atwood Dep., p. 63, ln. 4-24 – p. 64, ln. 6.

31.     Onset is not the owner of the Lease in this case.  Remington Atwood, Onset's corporate representative, testified that "I believe that it [the Lease] was assigned to CW Onset." App. Ex. F, Atwood Dep., p. 15, ln. 14 – p. 21.  He testified that, where a lease is assigned to CW Onset and the lessee does not pay what is owed under that lease, "[t]he monetary loss would be to CW Onset." *Id*. at p. 43, ln. 7 – p. 44, ln. 4.

## ARGUMENT

**1.     The Bond Cannot be Enforced Because Westchester Executed the Bond Based on Onset's Constructive Fraud in Failing to Disclose the Highly Negative Results of Onset's Own Underwriting.**

"Courts have recognized that in the case of certain relationships, such as those of surety or guarantor, there exists something in the nature of a confidential relationship requiring the utmost good faith and full and fair disclosure of all material facts." Section 106, W.P. Keeton, Prosser and Keeton, on the Law of Torts, at 739 n. 42, 5th Edition 1984.  In *First Security Bank v. Banberry Development Corporation*, 789 P.2d 1326 (Utah 1990), the Supreme Court of Utah discussed the duties of disclosure between parties to a business transaction noting the statement in Prosser and Keeton that "In releases, and contracts of insurance, practically all material facts must be disclosed."  *Id*. at 1331.

The Utah Insurance Code codifies this principle in section 1A-31-103.  This section states:

> Fraudulent insurance act.
>
> (1)     A person commits a fraudulent insurance act if that person with intent to deceive or defraud:
>
> (a)     knowingly presents or causes to be presented to an insurer any oral or written statement or representation knowing that the statement or representation contains false, incomplete, or misleading information concerning any fact material to an application for the issuance or renewal of an insurance policy, certificate, or contract

Onset knew it was dealing with an insurance company seeking the Bond at issue and knew full well what information it presented to Westchester for the Bond. Obviously, Onset also knew it omitted to disclose that the lease transaction did not meet its basic underwriting criteria and "that this is by far the riskiest deal that we have presented . . ."  App. Ex. B, Brulenski Aff., ¶ 18.

17

Case 2:16-cv-00063-JNP-PMW   Document 59   Filed 01/09/17   Page 18 of 26

**2.      The Notice to Westchester Was Not Timely.**

A condition precedent for Westchester having any liability under the Bond was:

> That in the case of an Event of Default (as defined in the Lease),
> the Obligee will give written notice to the Surety of such Event of
> Default within sixty (60) days after Obligee gives written notice to
> Principal of such Event of Default.

*Onset Complaint*, Ex. A [ECF # 2-1].

In an attempt to make it appear that it complied with that condition precedent, Onset has

argued that it gave notice of the default to Westchester on June 29, 2015, which it claims was the

sixtieth day after it issued a default notice to the Lessees, which was not cured ten days later.

Finlinson Decl., Ex. B [ECF #41-2].  In fact, there were multiple defaults that occurred more

than sixty days before June 29, 2015. That being the case, Onset has not satisfied the express

condition precedent given for liability under the Bond.

Onset argues that to the extent it gave untimely notice, Westchester may only assert as a

defense the damage that arose from such late notice.  The payment history of the Lessees shows

repeated defaults throughout 2015. The June 29, 2015, letter stated:

> Sondial Properties, LLC and Family Practice of Atlanta Medical
> Group, LLC (collectively "Lessees") are in default of their
> obligations under the above described Master Lease Agreement
> and Lease Schedule to Master Lease Agreement (collectively
> referred to as the "Lease"). In particular, Lessees failed to make
> Progress Payment Charges, beginning at least since February,
> 2015, as required under the Master Progress Payment Agreement
> entered into in connection with the Lease.

Finlinson Decl., Ex. A [ECF #41-1].

In spite of this history or repeated defaults, Onset unnecessarily waited to take any action,

thereby impairing the security of both Onset and Westchester in the collateral, which was the

leased property, which remains in the possession of the Lessees. As the issuer of the Bond, early

18

and proper notice to Westchester of a payment default was critical to Westchester's ability to preserve its interest in the leased property. By not informing Westchester of the Lessees' multiple defaults, Westchester was deprived of the only real remedy that was available to it, which was to seek to obtain possession of the leased property. App. Ex. D, Bresel Aff., ¶ 5. By not informing Westchester of these multiple defaults, Westchester could not act on its own behalf, forcing it to rely upon the actions of Onset, which have proven to be highly ineffective. The leased property is not in Onset's possession, and it is not in the possession of Westchester. App. Ex. E, Kennedy-Coggins Decl., ¶¶ 4-5.

As Atwood testified, "when we initially spoke to the lessees, they asked for the first few months, so it was not just November/December. We pushed January's payment back 30 days," App. Ex. F, Atwood Dep., p. 90, ln. 15-18.  Atwood further testified: "I believe February's payment then was also not due until April 10th, so what normally would have been March 10th was deferred 30 days as well, so we did it for the first few months, which is what we had negotiated with them and with our underwriter on the transaction." *Id*. at p. 90, ln. 20-25. Despite these material changes to the terms of the lease and the Lessees' payments schedule, and the repeated allowance of late payments, Atwood admitted that Onset "did not inform the bonding company of the change in terms of the payment requirements." *Id*. at p. 91, ln. 2-5. Atwood admitted that what he described above was a change in payment terms to allow the invoice to be paid in March when ordinarily it would have been due earlier. *Id*. p. 91, ln. 14-20.

To summarize, Onset permitted the Lessees' defaults by effectively changing the lease terms. In that regard, Onset improperly used the Bond to avoid liability for its unreasonable risks without giving notice to Westchester and without Westchester's consent. Even so, Atwood admitted that the Lessees failed to make timely payments to Onset as required under the Lease

during the period of February through June 2015.  App. Ex. F, Atwood Dep., p. 90, ln. 15-18.

Specifically, Atwood stated that the Lessees failed to make the required payments to Onset

during the period February 2015 through June 2015, which constituted a material breach of the

underlying agreements.  App. Ex. F, Atwood Dep., p. 90, ln. 15-18.

      Further, Onset entered into a forbearance agreement effective April 30, 2015. App. Ex. F,

Atwood Dep., p. 105, ln. 20 – p. 106, ln. 8 & Ex. 50.  The Lessees made their first payment

under the forbearance agreement and then in June they had a required payment that they missed.

App. Ex. F, Atwood Dep., p. 114, ln. 19 – 115, ln. 5. According to Atwood, after that missed

June 2015 payment, "there were some discussions there, but I don't know that we were able --

ever able to get comfortable with those discussions of have enough confidence that Al [the

Lessees] would be able to continue to make payment." *Id*. at p. 115, ln. 6-10. By letter dated June

29, 2015, Onset finally notified the Lessees that they were in default of the Lease.  Finlinson

Decl., Ex. A [ECF #41-1]. On the same day, Onset demanded that Westchester pay the amount

secured by the Bond.  Finlinson Decl., Ex. B [ECF #41-2]. As such, Onset materially jeopardized

Westchester's position by failing to notify Westchester of the previous defaults, keeping

Westchester informed of the overall negotiations, or getting Westchester's consent for the

additional risks involving the Bond and the lease agreement.

      Despite missed payments under the Lease starting to occur as early as February 2015, the

delivery of leased equipment began in January 2015 but continued into at least October 2015.

App. Ex. G, Bagley Dep., p. 120, ln. 8-12; p. 122, ln. 14 – p. 123, ln. 11; p. 136, ln. 11 – p. 137,

ln. 8; p. 138, ln. 17-24; p. 139, ln. 3 – p. 140, ln. 4; p. 142, ln. 2-8, 24 – p. 143, ln. 7; p. 152, ln. 7

– p. 153, ln. 18; p. 154, ln. 1 – p. 155, ln. 4; p. 155, ln. 13 – p. 156, ln. 21; p. 162, ln. 6 – p. 163,

ln. 21; p. 164, ln. 15 – p. 165, ln. 13; p. 179, ln. 13 – p. 180, ln. 16.  If Westchester had received

timely notice that the Lessees' were unable to pay in accordance with the original lease that was the subject of the Bond, or notice that Onset changed the lease terms, Westchester could have taken action to protect itself from loss as set forth in the Affidavit of David A. Bresel.  App. Ex. D, Bresel Aff., ¶ 5.

Onset, through Atwood, has even acknowledged that it does not know precisely when or whether the equipment under the Lease was delivered. When asked if Onset had physical confirmation that the equipment under the Lease was delivered and, in fact, present where it should be, Atwood admitted that: "I don't believe that in this case we have ever been able to get that confirmation." App. Ex. F, Atwood Dep., p. 62, ln. 2-6. Atwood further admitted that Onset was never able to inspect the delivered equipment.  App. Ex. F, Atwood Dep., p. 63, ln. 15-18. Atwood testified that his guess on why the inspection never took place was "that when we attempted the inspection, at that point he [Alphonso Waters of the Lessees] had missed his payment for the month ….and so he probably was just being difficult."  App. Ex. F, Atwood Dep., p. 63, ln. 4-24 – p. 64, ln. 6.

Essentially, had Onset given Westchester notice of the earlier defaults, it would have had the opportunity to obtain possession of the leased property.

3.    **Prejudice under Utah Code Sec. 31A-21-312(2) is a Question of Fact in This Case and Cannot be Summarily Decided.**

In its Motion, Onset asserts that Westchester cannot avoid its obligations under the Bond by claiming untimely notice of the claim because it cannot show it was prejudiced by any alleged late notice. Utah Code Section 31A-21-312(2) provides:

> Failure to give notice or file proof of loss as required by
> Subsection (l)(b) does not bar recovery under the policy if the

insurer fails to show it was prejudiced by the failure.

In *Transwest Credit Union v. Cumis Insurance Society, Inc.*, No. 2:09-CV-297-TA, 2010 U.S. Dist. LEXIS 99245 (D. Utah Sept. 21, 2010), timely notice was not given. The issue was whether the insurer was prejudiced by the failure. The court held that "[i]f the matter of prejudice 'could depend on a variety of factors,' then it is almost certainly a matter for a fact-finder to determine." *Id*. at *3 *citing Mullin v. Travelers Indemn. Co. of Conn.*, 541 F.3d 1219, 1227 (10th Cir. 2008).

In the present case, questions of fact abound as to whether Westchester was prejudiced by the delay in giving notice. To support that argument, one need look no further that Westchester's interest in the leased equipment was imperiled by Onset's failure to give Westchester earlier notice of the defaults that existed. As discussed above, had Westchester been given such notice, it could have acted to prevent the dissipation of the leased property in which it had a security interest.  App. Ex. D, Bresel Aff., ¶ 5.  Instead, Onset waited until it was too late and now seeks damages for Onset's unreasonable actions or lack thereof.  Westchester should be given the opportunity to prove at trial how it was prejudiced by the failure of Onset to give proper notice of the Lessees' multiple defaults.

**4.    Onset May Not Disclaim Responsibility for Recovery of the Leased Equipment Collateral.**

Onset asserts that it has no duty to recover the $2.6 million of leased property.  In effect it argues that whatever the status and value of the leased property has no bearing on its entitlement to recover the amount of the Bond without reduction.  It cites for this proposition a Texas case, *Commercial Credit Equipment Corp. v. Hatton*, 429 F. Supp. 997 (N.D. Tex. 1977), which holds

that where a creditor is not in possession of the collateral, the surety guarantor cannot assert a discharge for the creditor's impairment of the collateral.

The present case presents different facts.  In June 2015, Onset, based on the Lessees' plain default, had an immediate right to possession.  Onset brought an action in the Superior Court for DeKalb County, Georgia docketed as *Onset Financial Inc. v. Sondial Properties*, Civil Action Number 15CV7947.  Now sixteen months later, to the best of Westchester's knowledge, Onset has recovered no collateral and, according to its Georgia counsel's most recent report, Onset does not know where Alfonso Waters has moved a significant portion of the leased equipment.  App. Ex. E, Kennedy-Coggins Decl., ¶¶ 4, 5.

In *Valley Bank and Trust Company v. Rite Way Concrete Forming, Inc.*, 742 P.2d 105 (Utah Ct. App. 1987), the court found that the guarantee was unconditional.  However, the creditor had also decided to proceed to recover its debt from the collateral.  In this situation, the creditor was unable to disclaim its responsibility for impairment of collateral without an explicit unequivocal provision in the guaranty documentation by which the guarantor waived its rights to assert impairment of collateral.   The Bond here also contains no such waiver.  Thus, in the present situation, Onset must account to Westchester for an amount of recovery from the collateral resulting from its reasonable actions in recovering and disposing of the collateral.  To date, there has been no such recovery and resolution of this issue is premature without further discovery, and if necessary, trial of the issue.

5.     **Plaintiff Is Not the Proper Party to Bring this Lawsuit.**

Onset is not the owner of the Lease in this case.  The statement in its memorandum of law that "Onset is the beneficiary of a Lease Payment Bond ('Bond') issued by defendant Westchester" is inaccurate.  Remington Atwood, Onset's corporate representative, testified that

"I believe that it [the Lease] was assigned to CW Onset."  App. Ex. F, Atwood Dep., p. 15, ln. 14 – p. 21.  He testified that, where a lease is assigned to CW Onset and the lessee does not pay what is owed under that lease, "[t]he monetary loss would be to CW Onset." *Id*. at p. 43, ln. 7 – p. 44, ln. 4.  (After Mr. Atwood testified that the lease had been assigned to CW Onset, Robert Boote by email on November 10, 2016, to counsel for Onset Mr. Boote confirmed Westchester's request for a copy of the assignment and all other documents bearing on that assignment.  No such documents have been produced to Westchester.)

According to Onset, CW Onset is also involved in underwriting transactions such as the lease in this case.  Mr. Atwood testified: "I believe Red Bridge Capital is one of the funds that CW Onset uses to fund their transactions, to fund the leases that it approves." App. Ex. F, Atwood Dep., p. 14, ln. 18 - 23. According to Atwood: "Red Bridge Capital is managed by the members of CW, Shane Peery, Paul Erickson … those members did do much of the underwriting and approved it, Red Bridge Capital would be aware of anything as well."  *Id*. at p. 76, ln. 10-14.

In a nutshell, Onset, which is sole plaintiff in this action, does not own the Lease that is the subject of this action. Therefore, it is not the proper party to bring this lawsuit. The Complaint should either be dismissed, or CW Onset should be substituted as the proper plaintiff and appropriate discovery allowed concerning the relationship between Onset and CW Onset.  If CW Onset is substituted as the plaintiff, Westchester is entitled to learn about the underwriting and due diligence conducted by CW Onsite before it agreed to fund the equipment lease.

## CONCLUSION

Onset's Summary judgment should be denied.  Onset's claim is barred by its failure to disclose, as mandated by statute and common law material negative information to Westchester

in connection with Onset's obtaining the Bond.  Onset changed the lease terms and did not give timely notice of those changes or of the Lessees' defaults.  Westchester should be permitted to take discovery of concerning the so far unsuccessful efforts of Onset to recover the leased equipment to establish Onset's actual damages.  Further, if the complaint is not dismissed, Westchester should be allowed to conduct discovery of CW Onset concerning the underwriting of the Lease, its involvement in the administration of the Lease and such damages as it may allege.

DATED this 9th day of January, 2017.

FABIAN VANCOTT

*/s/ SCOTT M. LILJA*
SCOTT M. LILJA
*Attorneys for Defendant/Third-Party Plaintiff*
*Westchester Fire Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 9th day of January, 2017, I caused a true and correct copy of the foregoing **WESTCHESTER FIRE INSURANCE COMPANY'S OPPOSITION TO ONSET FINANCIAL, INC.'S MOTION FOR SUMMARY JUDGMENT** to be served via the Court's electronic filing system to counsel of record who have made an appearance in this action.

*/s/ Scott M. Lilja*